UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| U.S. Bank Trust National Association, as Trustee of the BKPL Series I Trust<br>    Plaintiff,<br><br>v.<br><br>Linda Ann Puchalski<br><br>    Defendant(s) | Civil Action No. |

## VERIFIED COMPLAINT

### Jurisdiction and Venue

1.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) since there is complete diversity between Plaintiff and all Defendants and the amount in controversy exceeds $222,973.00.

2.    Venue is proper under 28 U.S.C. § 1391(b)(2) since the real property that is subject to this complaint is located in the State of Rhode Island.

3.    Plaintiff seeks to foreclose a mortgage to Plaintiff pursuant to R.I.G.L. § 34-27-1, et seq.

### Parties

4.    Plaintiff U.S. Bank Trust National Association, as Trustee of the BKPL Series I Trust has a usual place of business at 7114 E. Stetson Drive, Scottsdale, Arizona 85251 (the "**Plaintiff**").

5.      Defendant Linda Ann Puchalski (the "**Defendant**") is an individual who,

upon information and belief, resides at 29 Johnson Lane, Charlestown, RI (the

"**Property**").

6.      The Property is further described by the Charlestown Tax Assessors as Lot

24.1, Plat 12.

<u>Facts</u>

7.      Frank D. Glista executed and delivered a warranty deed for the Property

to Defendant Linda Ann Puchalski, which deed is dated July 19, 1985 and was recorded

on July 22, 1985 in Land Evidence Records for the Town of Charlestown at book 80 page

427. *See* **Exhibit A**.

8.      There is an unbroken chain of title of not less than 40 years, which creates

marketable record title in Defendant pursuant to R.I.G.L. § 34-13.1-2. See **Exhibit B**.

9.      Defendant Linda Ann Puchalski executed and delivered a note dated

April 3, 2008 to Bank of America, N.A. in the original principal amount of $222,973.00

(the "**Note**"). See **Exhibit C**.

10.     The note is indorsed in blank.

11.     U.S. Bank Trust National Association, as Trustee of the BKPL Series I

Trust is the current holder of the Note.

12.     SN Servicing Corporation is the servicer of the loan.

13.     As security for the Note, Defendant Linda Ann Puchalski executed,

granted and delivered a mortgage in the amount of $222,973.00 containing a power of

sale to Bank of America, N.A., dated April 3, 2008, and recorded in the Land Evidence

Records for the Town of Charlestown on May 1, 2008 at Book 320 at Page 282 (the "**Mortgage**").  See **Exhibit D**.

14.     The Mortgage was assigned from Bank of America, N.A. to LSF9 Master Participation Trust.  See **Exhibit E**.

15.     The Mortgage was further assigned from LSF9 Master Participation Trust to U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust Company. See **Exhibit F**.

16.     The Mortgage was further assigned U.S. Bank Trust, N.A., as Trustee for LSF9 Master Participation Trust Company to Goldman Sachs Mortgage Company. See **Exhibit G.**

17.     The Mortgage was further assigned from Goldman Sachs Mortgage Company to U.S. Bank Trust National Association as Trustee of the BKPL Series I Trust. See **Exhibit H.**

18.     The Mortgage is secured by the Property located in the Town of Charlestown, more particularly described as follows:

THAT CERTAIN TRACT OR PARCEL OF LAND SITUATED ON THE
WESTERLY SIDE OF TOCKWOTTAN COVE ROAD, SO-CALLED, IN THE
TOWN OF CHARLESTOWN, COUNTY OF WASHINGTON, AND STATE OF
RHODE ISLAND, AND BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WESTERLY SIDE OF TOCKWOTTAN
COVE ROAD, A TOWN HIGHWAY, AT THE NORTHEAST CORNER OF THE
PARCEL HEREIN DESCRIBED, SAID POINT BEING 306.81' SOUTHERLY
FROM THE SOUTHERLY HIGHWAY LINE OF OLD POST ROAD; THENCE
PROCEED SOUTHERLY ALONG TOCKWOTTAN COVE ROAD A DISTANCE
OF 217.85' TO A POINT AT THE SOUTHEST CORNER OF THE PARCEL;
THENCE TURN AN INTERIOR ANGLE OF 90°-00'-00" AND PROCEED
WESTERLY A DISTANCE OF 220.00' TO A POINT AT THE SOUTHWEST
CORNER OF THE PARCEL HEREIN CONVEYED, BOUNDED SOUTHERLY
PARTIALLY BY A PORTION OF AN EXISTING RIGHT OF WAY AND
PARTIALLY BY LAND OF MATTHEW A. AND ALEXANDRIA S.
PUCHALSKI; THENCE TURN AN INTERIOR ANGLE OF 93°-28'-44" AND
PROCEED NORTHERLY A DISTANCE OF 172.08' TO A POINT, BOUNDED
WESTERLY BY OTHER LAND NOW OR FORMERLY OF B. JAMES GLISTA
AND GENEVIEVE D. GLISTA; THENCE TURN AN INTERIOR ANGLE OF
97°49'-46" AND PROCEED EASTERLY A DISTANCE OF 235.0' TO THE
POINT AND PLACE OF BEGINNING, BOUNDED NORTHERLY PARTIALLY
BY LAND OF WESLEY AND NELCY H. FORMLESTER AND PARTIALLY BY
A 33' RIGHT OF WAY OWNED BY B. JAMES GLISTA AND GENEVIEVE D.
GLISTA, THIS LAST COURSE MAKES AN INTERIOR ANGLE OF 78°-41'30"
WITH THE FIRST COURSE HEREIN DESCRIBED, ALL OF WHICH
CONTAINS AN AREA OF 43,995 SQ. FT.

SUBJECT TO AN EXISTING 33' WIDE RIGHT OF WAY ADJACENT TO AND
PARALLEL WITH TOCKWOTTEN COVE ROAD ALONG THE EASTERLY
SIDE OF THE PARCEL ABOVE DESCRIBED.

TAX ID #: 012/024/081

19.     Plaintiff, U.S. Bank Trust National Association, as Trustee of the BKPL

Series I Trust is the present holder of the Note and Mortgage.

COUNT I

20.     Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-

19 as if restated herein.

21.     Defendant is in default in the performance of the terms and conditions of

the Note by reason of failure to timely tender principal and interest payments as

required by the terms of the Note.

22.     As of February 6, 2021, the sum of $7,024.46 was necessary to cure the

default.

23.    As a result of the default, Plaintiff is entitled to foreclose the sums due and owing in connection with the Note.

24.    As of January 7, 2021, the sum of $229,445.86 was due and owing to Plaintiff from Defendant in connection with the Note.

25.    Defendant has no defenses or right of set off with respect to the amounts due in connection with the Note, with the exception of any deficiency balance due and owing in connection with the Note which may have been discharged in bankruptcy.

26.    On or about January 7, 2021, Plaintiff, via its authorized servicer of the Mortgage, sent a notice of default and demand to the notice and default provisions of the Mortgage.

27.    On or about March 24, 2021, Plaintiff or its predecessor in interest, or authorized servicer of the Mortgage, or anyone holding under the Mortgage, by its attorneys, sent a notice of acceleration of the debt pursuant to the notice and default provisions of the Mortgage.

## COUNT II

28.    Plaintiff realleges and reaffirms the allegations set forth in paragraphs 1-27 as if restated herein.

29.    Defendant, Linda Ann Puchalski, as the present owner of the Property, is the owner of the equity of redemption of the Property.

30.    Defendant is in default in the performance of the terms and conditions of the Mortgage, namely, default in the payment of principal and interest of the Note secured by the Mortgage.

31.      Plaintiff is entitled to foreclose the Mortgage, in full or partial satisfaction of the Defendant's obligations in connection with the Note and Mortgage pursuant to their terms and applicable law.

32.      Plaintiff is entitled to foreclose the Mortgage by entry and possession and by exercise of the power of sale contained therein, in accordance with R.I.G.L. § 34-27-1, et seq.

33.      Upon information and belief and upon examination of the public records, there are no other parties with an equitable interest in the Property.

34.      Upon information and belief and upon examination of the public records, there are no other parties with a mortgage, lien or encumbrance with respect to the Property.

35.      Upon information and belief, there are no persons having any interest of ownership who are in the Military Service of the United States of America or otherwise entitled to the relief and benefits provided by the Act of Congress known as the Soldiers' and Sailors' Civil Relief Act of 1940, as amended.  See **Exhibit I.**

WHEREFORE, Plaintiff prays that the following relief enter:

1.   That an order of notice issue on this Complaint, if the Court deems appropriate;

2.   Declare that the Mortgage recorded in the Land Evidence Records for the City of Pawtucket is a valid lien on the Property;

3.   Declare that Defendant, Linda Ann Puchalski are in default of the terms and conditions of the Note and Mortgage;

4. Enter an interlocutory decree authorizing the Plaintiff to foreclose the Mortgage recorded in the Land Evidence Records for the Town of Charlestown on May 1, 2008 in book 320 at page 282;

5. Enter judgment in favor of Plaintiff for the sums due and owing from Defendant in connection with the Note and Mortgage with the exception of any deficiency balance due and owning in connection with the Note which may have been discharged in bankruptcy;

6. Enter an Order authorizing Plaintiff to satisfy its Judgment from the foreclosure pursuant to the terms of the Mortgage;

7. The Court approve the acts of the Plaintiff done and performed under the authority of any interlocutory decree authorizing a foreclosure sale and enter a final decree confirming the foreclosure sale; and

8. Such other and further relief as this Honorable Court deems meet and just.

Respectfully submitted,

U.S. Bank Trust National Association, as
Trustee of the BKPL Series I Trust
By its attorney

David A. Shaw, Esq. (RI Bar No. 3497)
Demerle Hoeger LLP
10 City Square, 4th Floor
Boston, MA 02129
(617) 337-4444
(617) 337-4496 (fax)
DSHAW@DHNewEngland.com

DATE:

*Verification Page to Follow*

## VERIFICATION

I reviewed the allegations set forth in the foregoing complaint and verify and affirm

that the allegations are true based on my review of the records maintained in the

ordinary course of business and review of the public records maintained by the Town of

West Warwick.  For those allegations set forth as information and belief, I believe them

to be true based on the information I reviewed.

By: _____

Name: Tanya Nava

Title: Asset Manager

SN Servicing Corporation

Date: Sept 28, 2022

EXHIBIT A

**WARRANTY DEED**
(statutory form)

Book 80 · Page 427

KNOW ALL MEN BY THESE PRESENTS, that I, FRANK D. GLISTA of Charlestown, Rhode Island, for consideration paid grant to LINDA ANN PUCHALSKI, whose mailing address is P.O. Box 696, Charlestown, Rhode Island, in FEE SIMPLE WITH WARRANTY COVENANTS:—

That certain tract or parcel of land situated on the westerly side of Tockwotten Cove Road, so-called, in the Town of Charlestown, County of Washington, and State of Rhode Island, and bounded and described as follows:

Beginning at a point in the westerly side of Tockwotten Cove Road, a Town Highway, at the northeast corner of the parcel herein described, said point being 306.81' southerly from the southerly highway line of Old Post Road; thence proceed southerly along Tockwotten Cove Road a distance of 217.85' to a point at the southeast corner of the parcel; thence turn an interior angle of 90°-00'-00" and proceed westerly a distance of 220.00' to a point at the southwest corner of the parcel herein conveyed, bounded southerly partially by a portion of an existing right of way and partially by land of Matthew A. and Alexandria S. Puchalski; thence turn an interior angle of 93°-28'-44" and proceed northerly a distance of 172.08' to a point, bounded westerly by other land now or formerly of B. James Glista and Genevieve D. Glista; thence turn an interior angle of 97°-49'-46" and proceed easterly a distance of 235.04' to the point and place of beginning, bounded northerly partially by land of Wesley and Noldy H. Forslester and partially by a 33' right of way owned by B. James Glista and Genevieve D. Glista, this last course makes an interior angle of 78°-41'30" with the first course herein described, all of which contains an area of 43,995 sq. ft.

Subject to an existing 33' wide right of way adjacent to and parallel with Tockwotten Cove Road along the easterly side of the parcel above described.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 19th day of July, 1985.

Frank D. Glista

STATE OF RHODE ISLAND
COUNTY OF WASHINGTON

In CHARLESTOWN, in said County, on the 19th day of July, 1985, before me personally appeared FRANK D. GLISTA, to me known and known by me to be the person executing the foregoing instrument, and he acknowledged said instrument, by him so executed, to be his free act and deed.

Paul F. Singer
Notary Public
PAUL F. SINGER

Received for record July 22, 1985, 12:50 PM, and recorded by

EXHIBIT B

. Book 69   Page 296

## WARRANTY DEED

KNOW ALL MEN BY THESE PRESENTS, That We, B. JAMES GLISTA and GENEVIEVE D. GLISTA, husband and wife, both of the Town of Charlestown, County of Washington, and State of Rhode Island, for consideration paid, grant to FRANK D. GLISTA, of the Town of Charlestown, County of Washington, and State of Rhode Island, [Mailing Address: Box 504, Charlestown, RI 02813], with WARRANTY COVENANTS:

That certain tract or parcel of land situated on the westerly side of Tockwotten Cove Road, so-called, in the Town of Charlestown, County of Washington, and State of Rhode Island, and bounded and described as follows:

Beginning at a point in the westerly side of Tockwotten Cove Road, a Town Highway, at the northeast corner of the parcel herein described, said point being 306.81' southerly from the southerly highway line of Old Post Road; thence proceed southerly along Tockwotten Cove Road a distance of 217.05' to a point at the southeast corner of the parcel; thence turn an interior angle of 90°-00'-00" and proceed westerly a distance of 220.00' to a point at the southwest corner of the parcel herein conveyed, bounded southerly partially by a portion of an existing right of way and partially by land of Matthew A. and Alexandria 'S. Puchalski; thence turn an interior angle of 93°-28'-44" and proceed northerly a distance of 172.00' to a point, bounded westerly by other land now or formerly of the grantors; thence turn an interior angle of 97°-89'-86" and proceed easterly a distance of 235.0' to the point and place of beginning, bounded northerly partially by land of Wesley and Nelcy H. Formiester and partially by a 33' right of way owned by the grantors, this last course makes an interior angle of 78°-41'-30" with the first course herein described, all of which contains an area of 43,905 sq. ft.

Subject to an existing 33' wide right of way adjacent to and parallel with Tockwotten Cove Road along the easterly side of the parcel above described.

The consideration for this conveyance is such that no documentary stamps are required.

WITNESS OUR HANDS this _15_ day of _February_, 1982.

B. James Glista

Genevieve D. Glista

STATE OF RHODE ISLAND
COUNTY OF WASHINGTON

In _Charlestown_, on the _15_ day of _February_ 1982, before me personally appeared the above-named B. JAMES GLISTA and GENEVIEVE D. GLISTA, husband and wife, both to me known and known by me to be the parties executing the foregoing instrument, and

they acknowledged said instrument, by them executed, to be their free act and deed.

Notary Public

Mildred L. Culshaw

Received for record November 16, 1982, 3:35 PM, and recorded by _Maureen D. Cardin_
Deputy Town Clerk

EXHIBIT C

LOAN NUMBER: ███████

# NOTE

04/03/08       CHARLESTOWN       RI
[Date]       [City]       [State]
29 JOHNSON LANE, CHARLESTOWN, RI 02813

[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $     222,973.00     (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is    BANK OF AMERICA, N.A.

I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of    6.000    %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the    1ST    day of each month beginning on JUNE 01, 2008 . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on    MAY 01, 2038    I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    BANK OF AMERICA, N.A., P.O. BOX 535318, ATLANTA, GEORGIA 30353-5318       or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $    1,336.84 .

## 4. BORROWER'S RIGHT TO PREPAY

I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE. A PAYMENT OF PRINCIPAL ONLY IS KNOWN AS A "PREPAYMENT." WHEN I MAKE A PREPAYMENT, I WILL TELL THE NOTE HOLDER IN WRITING THAT I AM DOING SO. I MAY NOT DESIGNATE A PAYMENT AS A PREPAYMENT IF I HAVE NOT MADE ALL THE MONTHLY PAYMENTS DUE UNDER THIS NOTE.

I MAY MAKE A FULL PREPAYMENT OR PARTIAL PREPAYMENT WITHOUT PAYING ANY PREPAYMENT CHARGE. AFTER PAYING ANY LATE FEES OR OUTSTANDING FEES THAT I OWE, THE NOTE HOLDER WILL USE MY PREPAYMENTS TO REDUCE THE AMOUNT OF PRINCIPAL THAT I OWE UNDER THIS NOTE. HOWEVER, THE NOTE HOLDER MAY APPLY MY PREPAYMENT TO THE ACCRUED AND UNPAID INTEREST ON THE PREPAYMENT AMOUNT BEFORE APPLYING MY PREPAYMENT TO REDUCE THE PRINCIPAL AMOUNT OF THIS NOTE. IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATES OR IN THE AMOUNT OF MY MONTHLY PAYMENT UNLESS THE NOTE HOLDER AGREES IN WRITING TO THOSE CHANGES.



610  870891294   N   001   001

MULTISTATE FIXED RATE NOTE – Single Family     Page 1 of 3
BS5N (0101)       VMP MORTGAGE FORMS • (800)521-7291

BS5R 03/31/08 8:33 A███████



## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of    15
calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be
    5.0              % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

BS5N (0101)

BS5R 03/31/08 8:33

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

PAY TO THE ORDER OF
WITHOUT RECOURSE
By
Bank of America, N.A.
CHRISTINA M. SCHMITT
ASSISTANT VICE PRESIDENT

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
LINDA ANN PUCHALSKY                                -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower

_____ (Seal)
                                                   -Borrower
                                                   (Sign Original Only)

BS5N (0101)                        Page 3 of 3
       BS5R 03/31/08 8:33 AM

EXHIBIT D

INST# 00000969
Bk# 320 Pg# 282

· LOA ▮▮▮▮▮

TOWN OF CHARLESTOWN, R.I.
JODI P. LACROIX CMC
Town Clerk
May 01, 2008 09:09:56A

3-5E

Prepared By: CHRISTINE MASON
BANK OF AMERICA, N.A.
1400 BEST PLAZA DRIVE
RICHMOND, VA 232270000

———————— [Space Above This Line For Recording Data] ————————

# MORTGAGE

Recording Requested by &
When Recorded Return To:
US Recordings, Inc.
2925 Country Drive Ste 201
St. Paul, MN 55117
44924232

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated APRIL 03, 2008 together with all Riders to this document.
(B) "Borrower" is LINDA ANN PUCHALSKI

Borrower is the mortgagor under this Security Instrument.
(C) "Lender" is BANK OF AMERICA, N.A.

Lender is a NATIONAL BANKING ASSOCIATION
organized and existing under the laws of THE UNITED STATES OF AMERICA

RHODE ISLAND – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3040 1/01

▮▮▮ –6(RI) (0208)

Page 1 of 10          Initials
VMP MORTGAGE FORMS - (800)▮▮▮-7291

CVRI 03/31/08 1:33 AM      

INST: 00000969   283
BK: 320 Pg:

Lender's address is 1400 BEST PLAZA DRIVE, RICHMOND, VA 232270000

Lender is the mortgagee under this Security Instrument.
(D) "Note" means the promissory note signed by Borrower and dated  APRIL  03,  2008  .
The Note states that Borrower owes Lender TWO HUNDRED TWENTY TWO THOUSAND NINE
HUNDRED SEVENTY THREE AND 00/100                                    Dollars
(U.S. $        222,973.00  ) plus interest. Borrower has promised to pay this debt in regular
Periodic Payments and to pay the debt in full not later than  MAY 01,  2038            .
(E) "Property" means the property that is described below under the heading "Transfer of Rights
in the Property."
(F) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(G) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider               ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider   ☐ 1-4 Family Rider
☐ VA Rider                     ☐ Biweekly Payment Rider          ☐ Other(s) [specify]

(H) "Applicable Law" means all controlling applicable federal, state and local statutes,
regulations, ordinances and administrative rules and orders (that have the effect of law) as well as
all applicable final, non-appealable judicial opinions.
(I) "Community Association Dues, Fees, and Assessments" means all dues, fees,
assessments and other charges that are imposed on Borrower or the Property by a condominium
association, homeowners association or similar organization.
(J) "Electronic Funds Transfer" means any transfer of funds, other than a transaction
originated by check, draft, or similar paper instrument, which is initiated through an electronic
terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize
a financial institution to debit or credit an account. Such term includes, but is not limited to,
point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire
transfers, and automated clearinghouse transfers.
(K) "Escrow Items" means those items that are described in Section 3.
(L) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or
proceeds paid by any third party (other than insurance proceeds paid under the coverages
described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or
other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv)
misrepresentations of, or omissions as to, the value and/or condition of the Property.
(M) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or
default on, the Loan.
(N) "Periodic Payment" means the regularly scheduled amount due for (i) principal and
interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
(O) "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.)
and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended
from time to time, or any additional or successor legislation or regulation that governs the same
subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and
restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan
does not qualify as a "federally related mortgage loan" under RESPA.

Initials:

-6(RI) (0308)                        Page 2 of 18                   040 1/01 (rev. 11/02)
CVRI 03/31/08 8:33

Case 1:22-cv-00388-WES-PAS   Document 1   Filed 10/27/22   Page 21 of 46 PageID #: 108

(P) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender, with Mortgage Covenants upon the Statutory Condition and with the Statutory Power of Sale, the following described property located in the COUNTY                                          of    WASHINGTON                                  :

[Type of Recording Jurisdiction]                        [Name of Recording Jurisdiction]
"LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF."

Parcel ID Number: 012024081                     which currently has the address of
29 JOHNSON LANE                                                      [Street]
CHARLESTOWN                        [City], Rhode Island  02813          [Zip Code]
("Property Address");

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

-6(RI) m264                         Page 3 of 16        Initials:          D 1/01 (rev. 11/02)
CVRI 03/31/06 8:33 A

INST: 00000969
Bk : 320 Ps : 285

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. Application of Payments or Proceeds. Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. Funds for Escrow Items. Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item.

Page 4 of 16

Initials:

0 1/01 (rev. 11/02)

Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in

CYR: 03/31/04 9:33

INST# 00000969
Bk: 320 Pg: 287

a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

, All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and

Case 1:22-cv-00388-WES-PAS Document 1 Filed 10/27/22 Page 25 of 46 PageID #: 112

INST: 00000969
Bk: 320 Pg: 288

restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or

Initial

RI--Single Family
CVRI 02/21/08 8:23 A

Page 7 of 18

040 1/01 (rev. 11/02)

with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for

Initials:

040 1/01 (rev. 11/02)

Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair

Initials

1/01 (rev. 11/02)

market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. Loan Charges. Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the

-6(RI) (0208)   Page 10 of 16   Initials: _____   Form 3040 1/01 (rev. 11/02)
CVRI 03/31/08 9:33 AM

INST# 00000969
Bk# 320 Pg# 292

charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. Notices. All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. Governing Law; Severability; Rules of Construction. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. Borrower's Copy. Borrower shall be given one copy of the Note and of this Security Instrument.

18. Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If

-6(RI) (0308)    CVRI 03/31/06 8:33 AM    Page 11 of 15    Initials: [signature]    1/01 (rev. 11/02)

Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. Borrower's Right to Reinstate After Acceleration. If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. Sale of Note; Change of Loan Servicer; Notice of Grievance. The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower

pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

. 22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender

Initials: _____

Page 13 of 16                          1/01 Rev. 11/02)

INST# 00000969
Bk# 320 Pg# 295

at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower as provided in Section 15. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, this Security Instrument shall become null and void. Lender shall discharge this Security Instrument. Borrower shall apply any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. No Outstanding Automatic Orders in Domestic Relations Cases. Borrower hereby represents and warrants to Lender that either (a) there is no outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against any Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation or (b) there is an outstanding automatic order under Chapter 15-5 of the Rhode Island General Laws against a Borrower relating to a complaint for dissolution of marriage, legal separation, annulment, custody or visitation, and the other party that is subject to such order has consented to, or the court which issued the automatic order has issued another order authorizing, such Borrower's execution of the Note and this Security Instrument.

25. Homestead Estate. If Borrower heretofore has acquired or hereafter acquires an estate of homestead in the Property, Borrower hereby agrees that such homestead estate is waived to the extent of this Security Instrument and the amount due under the Note and to the extent of all renewals, extensions and modifications of this Security Instrument or the Note, and that said homestead estate is subject to all of the rights of Lender under this Security Instrument and the Note and all renewals, extensions and modifications of this Security Instrument and the Note, and is subordinate to the lien evidenced by this Security Instrument, and all renewals, extensions and modifications of this Security Instrument. Furthermore, Borrower hereby waives the benefits of any homestead or similar laws or regulations that may otherwise be applicable from time to time.

SUN (0308)
CVR: 03/31/03 8:33 AM

Initials
Form 3040 1/01 (rev. 11/02)

INST: 00000969
Bk: 320 Ps: 296

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____ (Seal)
                           -Borrower

_____ (Seal)
                           -Borrower

_____ (Seal)      _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
                           -Borrower                                 -Borrower

_____ (Seal)      _____ (Seal)
                           -Borrower                                 -Borrower

-6(RI) (0308)       Page 16 of 16       Form 3040 1/01 (rev. 11/02)
CVR1 03/31/08 8:33 A

INST= 00000969
Bk: 320 Pg: 297

STATE OF RHODE ISLAND,
County ss:

On this 3rd day of April 2008 , in Charlestown,
Washington County , in said County, before me personally appeared

Linda Ann Puchalski

each and all to me known and known
to me to be the person(s) executing the foregoing instrument and acknowledged said execution to
be his/her/their free act and deed.

Notary Public
ANTHONY BATEMAN
my commission expires 11/13/11

Initials:
Form 3040 1/01 (rev. 11/02)
CVR1 03/31/08

—SØRII (0200)

EXHIBIT E

Recording Requested By:
T.D. SERVICE COMPANY

BK# 404 PG# 481
INST# 00000937

Prepared By:
T.D. Service Company
LR Department
4000 W Metropolitan Dr Ste 400
Orange, CA 92868
(714) 543-8372, DAWNA HANSON

TOWN OF CHARLESTOWN, R.I.
ANY ROSE WEINREICH
TOWN CLERK
May 08,2015 01:14:00P

And When Recorded Mail To:
T.D. Service Company
LR Department (Cust# 673)
4000 W Metropolitan Dr Ste 400
Orange, CA 92868
(714) 543-8372

_____ Space above for Recorder's use _____

Customer#: 673/2   Service#: [barcode]   |||||| |||| |||| ||||| |||| ||||| ||| |||| |||||| ||| ||| |||+
Loan#:

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, BANK OF AMERICA, N.A., C/O CALIBER HOME LOANS, INC. 13801
WIRELESS WAY, OKLAHOMA CITY, OK 73134-2550, hereby assign and transfer to LSF9 MASTER
PARTICIPATION TRUST, C/O CALIBER HOME LOANS, INC. 13801 WIRELESS WAY,
OKLAHOMA CITY, OK 73134-2550, all its right, title and interest in and to said Mortgage in the amount of
$222,973.00, recorded in the State of RHODE ISLAND, County of WASHINGTON, Township of
CHARLESTOWN TOWN Official Records, dated APRIL 03, 2008 and recorded on MAY 01, 2008, as
Instrument No. 00000969, in Book No. 320, at Page No. 282.
Executed by: LINDA ANN PUCHALSKI (Original Mortgagor).
Original Mortgagee: BANK OF AMERICA, N.A.. Property Address: 29 JOHNSON LANE,
CHARLESTOWN, RI 02813-0000.

Date: **MAY 0 4 2015**

BANK OF AMERICA, N.A., BY CALIBER HOME LOANS, INC., AS ITS ATTORNEY IN FACT

By: _____
Michelle Hess, Assistant Secretary

Loan#: [redacted]   Srv#: [redacted]
Page 2

BK# 404 PG# 482
INST# 000005937

A notary public or other officer completing this certificate
verifies only the identity of the individual who signed the
document to which this certificate is attached, and not the
truthfulness, accuracy, or validity of that document.

State of   **CALIFORNIA**
County of  **ORANGE**                    }
                                         } ss.

On __MAY 0 4 2015__, before me, **Jamie Van Keirsbelk**, a Notary Public, personally appeared   Michelle
Hess , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed
to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.  I certify under PENALTY OF PERJURY under the laws of
the State of California that the foregoing paragraph is true and correct.
Witness my hand and official seal.

(Notary Name): **Jamie Van Keirsbelk**



JAMIE VAN KEIRSBELK
COMM. # 2013677
NOTARY PUBLIC CALIFORNIA
ORANGE COUNTY
My comm. expires March 21, 2017

EXHIBIT F

BK " 4 X W PGT 8380
FMWY a FECORDED 8880

TOWN OF CHARLESTOWN, R.1
AMY ROSE WEIHRICH
TOWN CLERK
Sep 19,2016 12:33:33P

Recording Requested By:
T.D. SERVICE COMPANY

Prepared By:
Caliber Home Loans, Inc.
13801 Wireless Way

Oklahoma City, OK 73134
(405) 608-2535, SATEESH K VASAMSETTI

And When Recorded Mail To:
Caliber Home Loans, Inc.
13801 Wireless Way
Oklahoma City, OK 73134
(405) 608-2535

_____ Space above for Recorder's use _____

Customer#: 1/1   Service#   |IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII-
Loan#

## ASSIGNMENT OF MORTGAGE

FOR VALUE RECEIVED, LSF9 MASTER PARTICIPATION TRUST, 13801 WIRELESS WAY, OKLAHOMA CITY, OK 73134-0000, hereby assign and transfer to U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST, 13801 WIRELESS WAY, OKLAHOMA CITY, OK 73134-0000, all its right, title and interest in and to said Mortgage in the amount of $222,973.00, recorded in the State of RHODE ISLAND, County of WASHINGTON, Township of CHARLESTOWN TOWN Official Records, dated APRIL 03, 2008 and recorded on MAY 01, 2008, as Instrument No. 00000969, in Book No. 320, at Page No. 282.

Executed by: LINDA ANN PUCHALSKI (Original Mortgagor),
Original Mortgagee: BANK OF AMERICA, N.A.. Property Address: 29 JOHNSON LANE, CHARLESTOWN, RI 02813-0000.

Date: JULY 11, 2016
LSF9 MASTER PARTICIPATION TRUST, BY ITS TRUSTEE U.S. BANK TRUST, N.A., THROUGH CALIBER HOME LOANS, INC., AS ATTORNEY IN FACT FOR THE TRUSTEE

By: _____
Mindi Coleman, Authorized Signatory

State of    OKLAHOMA                )
County of   OKLAHOMA                ) ss.

On JULY 11, 2016 , before me, Nancy Ortiz, a Notary Public, personally appeared   Mindi Coleman , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
Witness my hand and official seal.

_____
(Notary Name): Nancy Ortiz
My commission expires: 09/29/2016

EXHIBIT G

Recording Requested By:

Prepared By: Audrey B Trumble
855-369-2410
When recorded mail to:

Case Nbr:
Ref Number:
Property Address:
29 JOHNSON LANE
CHARLESTOWN, RI 02813
RIO-AM-GSMTGI37612791   11/21/2019  LONESTAR-7

BK# 456 PG# 587
INST# 00000514

TOWN OF CHARLESTOWN, R.I.
AMY ROSE WEINREICH
TOWN CLERK
.....Mar. 09, 2020 02:04:27P -

This space for Recorder's use

## ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 13801 WIRELESS WAY, OKLAHOMA CITY, OK 73134 does hereby grant, sell, assign, transfer and convey unto GOLDMAN SACHS MORTGAGE COMPANY whose address is 2001 ROSS AVENUE, SUITE 2800, DALLAS, TX 75201 all beneficial interest under that certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

| | |
|---|---|
| Mortgagee: | BANK OF AMERICA, N.A. |
| Borrower(s): | LINDA ANN PUCHALSKI |
| Date of Mortgage: | 4/3/2008 |
| Original Loan Amount: | $222,973.00 |

Recorded in Charlestown Township, RI on: 5/1/2008, book 320, page 282 and Instrument number 00000969

IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on
Dated: --FEB-2-4-2020--

U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST BY GOLDMAN SACHS MORTGAGE COMPANY, ITS ATTORNEY-IN-FACT

By:
Biff Rogers, Vice President

State of TX, County of Dallas

On __FEB 2 4 2020__, before me, Michael Franco, a Notary Public, personally appeared Biff Rogers, Vice President of GOLDMAN SACHS MORTGAGE COMPANY as Attorney-In-Fact for U.S. BANK TRUST, N.A., AS TRUSTEE FOR LSF9 MASTER PARTICIPATION TRUST personally known to me to be the person(s) whose name(s) is/are subscribed to the within document and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the document the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal.

Notary Public: Michael Franco
My Commission Expires: MAY 0 8 2021

MICHAEL FRANCO
Notary Public State of Texas
My Commission# 131120829
My Comm. Exp. May 08, 2021

Page 1 of 1



EXHIBIT H

Recording Requested By:

Prepared By: Audrey B Trumble
855-369-2410
When recorded mail to:

Meridian Asset Services
Attn: Doc Intake
3201 34th Street South, Suite 310
St, Petersburg, FL 33711

Case Nbr: ~
Ref Number:
Property Address:
29 JOHNSON LANE
CHARLESTOWN, RI 02813
RIO-ASI-STD          9/30/2020  APOOS

BK#   465  PG#   517
INST#  00002640

TOWN OF CHARLESTOWN, R.I.
AMY ROSE WEINREICH
TOWN CLERK
Oct 27,2020 03:04:02P

This space for Recorder's use

# ASSIGNMENT OF MORTGAGE

For Value Received, the undersigned holder of a Mortgage (herein "Assignor") whose address is 2001 ROSS AVENUE, SUITE 2800, DALLAS, TX 75201 does hereby grant, sell, assign, transfer and convey unto U.S. BANK TRUST NATIONAL ASSOCIATION, AS TRUSTEE OF THE BKPL SERIES I TRUST whose address is 7114 E STETSON DRIVE, SUITE 250, SCOTTSDALE, AZ 85251 all beneficial interest under a certain Mortgage described below together with the note(s) and obligations therein described and the money due and to become due thereon with interest and all rights accrued or to accrue under said Mortgage.

Mortgagee:          BANK OF AMERICA, N.A.
Borrower(s):        LINDA ANN PUCHALSKI
Date of Mortgage:   4/3/2008
Original Loan Amount: $222,973.00

Recorded in Charlestown Township, RI on: 5/1/2008, book 320, page 282 and instrument number 00000969
IN WITNESS WHEREOF, the undersigned has caused this Assignment of Mortgage to be executed on
Dated: 9/30/2020

GOLDMAN SACHS MORTGAGE COMPANY BY
CORELOGIC SOLUTIONS, LLC ITS ATTORNEY IN
FACT

By:

Jessica Lykins, Assistant Vice President

STATE OF TX

COUNTY OF Dallas

On 9/30/2020 (date), before me, RATANAPHONE VILAYLEUTH, a Notary Public, personally appeared Jessica Lykins, Assistant Vice President of CORELOGIC SOLUTIONS, LLC AS ATTORNEY IN FACT FOR GOLDMAN SACHS MORTGAGE COMPANY personally known to me to be the person(s) whose name(s) is/are subscribed to the within document and acknowledged to me that he/she/they of his/her/their free act and deed executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the document the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

Witness my hand and official seal,

Notary Public
Printed Name: RATANAPHONE VILAYLEUTH
My Commission Expires : 3/6/2024

RATANAPHONE VILAYLEUTH
Notary Public, State of Texas
Comm. Expires 03-06-2024
Notary ID 132392017

EXHIBIT I

Department of Defense Manpower Data Center

Results as of : Jul-29-2022 10:34:32 AM

SCRA 5.14



**Status Report**
**Pursuant to Servicemembers Civil Relief Act**

SSN:            XXX-XX-4806
Birth Date:
Last Name:      PUCHALSKI
First Name:     LINDA
Middle Name:    ANN
Status As Of:   Jul-29-2022
Certificate ID: 9SZ19032GRVTV4K

| On Active Duty On Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects the individuals' active duty status based on the Active Duty Status Date | | | |

| Left Active Duty Within 367 Days of Active Duty Status Date | | | |
|---|---|---|---|
| Active Duty Start Date | Active Duty End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects where the individual left active duty status within 367 days preceding the Active Duty Status Date | | | |

| The Member or His/Her Unit Was Notified of a Future Call-Up to Active Duty on Active Duty Status Date | | | |
|---|---|---|---|
| Order Notification Start Date | Order Notification End Date | Status | Service Component |
| NA | NA | No | NA |
| This response reflects whether the individual or his/her unit has received early notification to report for active duty | | | |

Upon searching the data banks of the Department of Defense Manpower Data Center, based on the information that you provided, the above is the status of the individual on the active duty status date as to all branches of the Uniformed Services (Army, Navy, Marine Corps, Air Force, NOAA, Public Health, and Coast Guard). This status includes information on a Servicemember or his/her unit receiving notification of future orders to report for Active Duty.

Michael V. Sorrento, Director
Department of Defense - Manpower Data Center
400 Gigling Rd.
Seaside, CA  93955

The Defense Manpower Data Center (DMDC) is an organization of the Department of Defense (DoD) that maintains the Defense Enrollment and Eligibility Reporting System (DEERS) database which is the official source of data on eligibility for military medical care and other eligibility systems.

The DoD strongly supports the enforcement of the Servicemembers Civil Relief Act (50 USC App. § 3901 et seq, as amended) (SCRA) (formerly known as the Soldiers' and Sailors' Civil Relief Act of 1940). DMDC has issued hundreds of thousands of "does not possess any information indicating that the individual is currently on active duty" responses, and has experienced only a small error rate. In the event the individual referenced above, or any family member, friend, or representative asserts in any manner that the individual was on active duty for the active duty status date, or is otherwise entitled to the protections of the SCRA, you are strongly encouraged to obtain further verification of the person's status by contacting that person's Service. Service contact information can be found on the SCRA website's FAQ page (Q35) via this URL: https://scra.dmdc.osd.mil/scra/#/faqs. If you have evidence the person was on active duty for the active duty status date and you fail to obtain this additional Service verification, punitive provisions of the SCRA may be invoked against you. See 50 USC App. § 3921(c).

This response reflects the following information:  (1) The individual's Active Duty status on the Active Duty Status Date (2) Whether the individual left Active Duty status within 367 days  preceding the Active Duty Status Date (3) Whether the individual or his/her unit received early notification to report for active duty on the Active Duty Status Date.

## More information on "Active Duty Status"

Active duty status as reported in this certificate is defined in accordance with 10 USC § 101(d) (1).  Prior to 2010 only some of the active duty periods less than 30 consecutive days in length were available.  In the case of a member of the National Guard, this includes service under a call to active service authorized by the President or the Secretary of Defense under 32 USC § 502(f) for purposes of responding to a national emergency declared by the President and supported by Federal funds.  All Active Guard Reserve (AGR) members must be assigned against an authorized mobilization position in the unit they support.  This includes Navy Training and Administration of the Reserves (TARs), Marine Corps Active Reserve (ARs) and Coast Guard Reserve Program Administrator (RPAs).  Active Duty status also applies to a Uniformed Service member who is an active duty commissioned officer of the U.S. Public Health Service or the National Oceanic and Atmospheric Administration (NOAA Commissioned Corps).

## Coverage Under the SCRA is Broader in Some Cases

Coverage under the SCRA is broader in some cases and includes some categories of persons on active duty for purposes of the SCRA who would not be reported as on Active Duty under this certificate.  SCRA protections are for Title 10 and Title 14 active duty records for all the Uniformed Services periods. Title 32 periods of Active Duty are not covered by SCRA, as defined in accordance with 10 USC § 101(d)(1).

Many times orders are amended to extend the period of active duty, which would extend SCRA protections. Persons seeking to rely on this website certification should check to make sure the orders on which SCRA protections are based have not been amended to extend the inclusive dates of service. Furthermore, some protections of the SCRA may extend to persons who have received orders to report for active duty or to be inducted, but who have not actually begun active duty or actually reported for induction.  The Last Date on Active Duty entry is important because a number of protections of the SCRA extend beyond the last dates of active duty.

Those who could rely on this certificate are urged to seek qualified legal counsel to ensure that all rights guaranteed to Service members under the SCRA are protected

WARNING:  This certificate was provided based on a last name, SSN/date of birth, and active duty status date provided by the requester.  Providing erroneous information will cause an erroneous certificate to be provided.